UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO. 19-22613-CIV-COOKE/GOODMAN

MERWIN LARREAL,

      Plaintiff,

v.

TELEMUNDO OF FLORIDA, LLC,

      Defendant.

_____/

**REPORT AND RECOMMENDATIONS ON**
**DEFENDANT TELEMUNDO'S SUMMARY JUDGMENT MOTION**

    Plaintiff Merwin Alexander Garcia Larreal is a Venezuelan citizen who overstayed his six-month visa to the United States and therefore became undocumented on August 6, 2016. Nevertheless, he illegally lived and worked in the United States after that date. Larreal worked as a head waiter at LaBare, an adult entertainment club featuring male dancers. LaBare is located in the same building as The Booby Trap, a so-called gentlemen's club featuring female dancers.

    In April 2018, as part of a long-term undercover narcotics investigation, state and federal law enforcement officers conducted a late-night raid of The Booby Trap and LaBare. Several employees from both clubs were arrested, including Larreal. Unlike the other arrestees, however, Larreal was arrested on a non-drug charge -- an outstanding

bench warrant issued after he failed to appear in Court on a charge of driving without a license.

After obtaining mugshots and arrest reports from the Miami-Dade Police Department, which also confirmed the accuracy of an earlier Miami Herald news article about the raid, Defendant Telemundo of Florida, LLC broadcast a news report about the raid. Telemundo identified the individuals arrested during the raid (including Larreal) but did not expressly identify and link specific charges for any of the arrestees.

Larreal filed a one-count defamation lawsuit against Telemundo. He alleged that Telemundo published false statements about him by implying that he was arrested in connection with the trafficking of cocaine and other controlled substances. Although he is not able to legally work in the United States, Larreal seeks to recover economic damages. He also seeks emotional damages. Larreal alleges that the broadcast has caused him mental anguish, loss of sleep, crying spells, headaches and depression.

Telemundo filed a summary judgment motion against Larreal's claim. [ECF No. 64]. It argues that the "fair report privilege" completely bars Larreal's action. At bottom, Telemundo says that the privilege applies because its broadcast was a substantially correct summary of information provided by an official government source (i.e., the police department). But Larreal contends that Telemundo abused the limited fair report privilege because the arrest report forwarded by the police indicated that Larreal was arrested on a traffic-related charge, having nothing to do with drug-dealing.

For the reasons outlined below, the Undersigned **respectfully recommends** that United States District Judge Marcia G. Cooke, who referred this motion to the Undersigned [ECF No. 120], **grant** Telemundo's summary judgment motion on the fair report privilege. In the event that Judge Cooke does not adopt this Recommendation, then the Undersigned also recommends the following, *alternative* rulings (but *only* if the Court disagrees with the conclusion that the fair report privilege applies): (1) Larreal cannot obtain economic damages because his immigration status precludes recovery of lost future profits; and (2) although his evidence is weak and a jury may well reject the claim, Larreal should be permitted to at least seek non-economic damages for mental anguish, humiliation and reputational injury. The evidentiary shortcomings pinpointed by Telemundo (and there are several) are more appropriate at trial; they are ill-suited for summary adjudication.

## I.   Comprehensive Undisputed Factual Background[1]

### a.   Undisputed Facts Highlighted by Telemundo

---

[1]      Telemundo filed a Statement of [Purportedly] Undisputed Facts. [ECF No. 65]. Larreal filed a response, contending that some of those facts were disputed. [ECF No. 131]. He then added his own supposedly undisputed facts, and Telemundo filed a response, asserting that some of Larreal's additional facts were actually disputed. [ECF No. 136]. The undisputed facts section in this Report is from the undisputed facts which remain after eliminating those which the other side challenged as actually being disputed. For some of these undisputed facts, the opposing party argued that they were legally immaterial to the pending motions. But the mere fact that a party raised a *legal* argument about materiality or relevancy did not prevent an undisputed fact from being listed here as a fact.

Larreal is a Venezuelan citizen. While in Venezuela, Larreal served as Commissioner of the Governor of Merida for Sexual Diversity, Gender and HIV from 2014 through 2016.

In February 2016, Larreal arrived in the United States on a tourist visa, which allowed him to visit the United States as a non-immigrant for a period of six months. At that time, Larreal leased a bedroom in Miami, Florida from Doris and Francisco Acosta. Larreal lived with the Acosta family until late October 2017.

As of August 6, 2016, Larreal has been undocumented and illegally residing in the United States. Due to his undocumented status, Larreal understands he is not allowed to procure work in the United States.

Larreal has never filed any tax returns or otherwise declared his income and has never paid taxes on his earnings from work in the United States.

Larreal has never possessed a valid driver's license issued by any state in the United States. On July 21, 2016, Larreal was pulled over while operating a vehicle in Miami, Florida and charged with driving without a driver's license. As a result of Larreal's failure to appear for a hearing on November 18, 2016, a bench warrant was issued for his arrest.

In his Complaint, Larreal alleges he was an employee of The Booby Trap on April 20, 2018. The Booby Trap is a gentleman's club in Miami-Dade County, Florida.

Larreal is actually not an employee of The Booby Trap, despite the allegations of

4

his complaint. Larreal began to work as a waiter at LaBare, an adult entertainment club located at 5325 NW 77th Avenue, in July 2016. LaBare is located *within* the same building and at the same address as The Booby Trap. In his response to Telemundo's Statement of Facts (filed in support of its summary judgment motion), Larreal said a scrivener's error was responsible for the incorrect designation of The Booby Trap (instead of LaBare) as his place of employment.

Three months after he began working at LaBare, Larreal was promoted to head waiter. Larreal is an independent contractor for LaBare, and he earns only cash tips.

On August 5, 2016, Larreal contacted Diego Rincon, expressing interest in extra work opportunities. Diego Rincon is a talent agent who operated the Media Luna Productions LLC and All Cast Background Talents LLC agencies. Through these agencies, Mr. Rincon procured extras for various programs produced by Telemundo and Univision. Mr. Rincon stopped working with Telemundo in April or May 2019 and stopped working with Univision in July 2019. Mr. Rincon ceased operations altogether in November 2019. Mr. Rincon's agencies were the only agencies through which Larreal secured extra work.

Larreal obtained his first job opportunity through Mr. Rincon's agency on August 13, 2016, when he appeared as a prison guard on a soap opera produced by Telemundo.

Eventually, Larreal obtained a Florida Identification Card issued to Alexis Acosta and began to use this identification and name to procure work at Telemundo. Larreal last

worked as an extra for Telemundo on October 11, 2017. Through Mr. Rincon's agency, Larreal was also able to procure work as an extra on Univision's Republica Deportiva program. Mr. Rincon testified Larreal was removed from his position at the program when complaints were made regarding Larreal being rude towards other extras on set.

Mr. Rincon also maintained a WhatsApp group chat with all extras working for his agency. Mr. Rincon removed Larreal from the general extras WhatsApp group chat, along with 17 others, on December 12, 2018. Mr. Rincon removed Larreal and the others then because they had not sought work in some time.

On April 20, 2018, state and federal law enforcement authorities conducted a late-night raid of The Booby Trap and LaBare complex in connection with a narcotics investigation.

Larreal was arrested because he had an outstanding bench warrant. Larreal was released from custody on April 21, 2018. Larreal returned to work at LaBare that night. On April 21, 2018, the Miami Herald published an article entitled "Drug Detectives Raid Booby Trap to Arrest Strippers, Spoiling Bachelorette Parties," which reported that Miami Dade Police Department ("MDPD") officers had raided The Booby Trap and LaBare complex to "arrest dancers and employees believed to have dealt cocaine, marijuana and other drugs." [ECF No. 65, ¶ 49].

Telemundo contacted the MDPD to verify that the information reported in the Miami Herald's article was accurate. Telemundo obtained confirmation that all of the

information in the Miami Herald's article was accurate. Relying on information published in the Miami Herald, which was subsequently confirmed by the MDPD, on April 21, 2018, Telemundo published a report concerning the raid.

On April 23, 2018, Telemundo made a public records request to the MDPD to obtain "the mug shots and arrest reports regarding the operation at Bobby [sic] Trap." *Id.* at ¶ 53. The MDPD provided eight mugshots, including Larreal's, and a single PDF file titled "Booby Trap Arrests." Telemundo published a follow-up broadcast on April 23, 2018 ("the News Report"). *Id.*

The News Report identified the individuals arrested during the raid, including Larreal. The News Report did not state Larreal had been arrested for the sale of drugs. The News Report did not identify Larreal's country of citizenship or his former position with the Venezuelan government.

Various Venezuelan social media sources picked up on the news story. One social media account used stills from Telemundo's reporting without permission, credited them as their own, and reported that Larreal, the Venezuelan ex-Commissioner of the Governor of Merida for Sexual Diversity, Gender and HIV, had been arrested "for the sale of drugs." *Id.* at ¶ 63. Other Venezuelan social media accounts picked up these photos and information to report Larreal had been arrested for the sale of drugs.

After the Venezuelan social media accounts began to publish these posts, Larreal began to experience difficulty sleeping, depression, and occasional head pressure

accompanied by loss of appetite and dizzy spells.

Larreal never sought treatment for any emotional-type symptoms and they subsided about a month after the social media posts surfaced.

On March 19, 2019, Larreal's counsel sent correspondence to Telemundo concerning the News Report. Telemundo aired a clarification on March 27, 2019 that clarified the reason Larreal had been arrested during the raid. At that time, Telemundo removed the News Report from its website and replaced it with the clarification, where it remains today.

Larreal initiated this action on April 18, 2019. In the Complaint, Larreal alleges a single count for defamation per se, alleging Telemundo published "false statements" about him by implying Larreal was arrested in connection with the trafficking of cocaine and other controlled substances while employed at The Booby Trap complex. [ECF No. 1-1, pp. 6-11]. Larreal seeks to recover economic damages and emotional damages.

b.    Undisputed Facts Highlighted by Larreal

In April 2018, reports aired by Telemundo, and the individuals who worked on them, were governed by Telemundo's Policies. The second page of Telemundo's Policies, under a heading titled "Accuracy and Fairness," provides, in relevant part, "Accuracy and fairness are fundamental principles of journalism. As we routinely rely on information and pictures coming from various sources, we must make every effort to verify accuracy and authenticity and to ensure fairness. Accuracy requires ensuring all of the facts are

correct and presenting them in proper context." [ECF No. 131, ¶ 74].

The same page of Telemundo's Policies, under a heading titled "Accuracy and Fairness," provides, in relevant part:

> Fairness is keeping an open mind about the nature of a story, making good faith and timely efforts to seek out and present all relevant facts and points of view and avoiding a rush to judgment. We should not enter a story with a preconceived notion. In meeting this standard, it is helpful to apply this test: if you were the subject of a story, would you be satisfied that you had been treated fairly? We should always attempt to contact the subject(s) of our reporting for comment giving them sufficient detail of our report and allowing reasonable time to respond.

*Id*. at ¶ 75.

Page 4 of Telemundo's Policies, under a heading titled "Sources of Information," provides, in relevant part, "NBC News and MSNBC are responsible for the elements of our news reports, whether obtained through our own reporting or from others. Therefore, you must verify information and material, whether visuals or documents, regardless of the source and present that information with as much transparency as possible." *Id*. at ¶ 76.

Page 7 of Telemundo's Policies, under a heading titled "Use of Documents," provides, in relevant part, "Make sure to read the entire document and present it in context." *Id*. at ¶ 77.

Page 11 of Telemundo's Policies, under a heading titled "Editing," provides, in relevant part:

> When editing, the final product must represent the original material fairly

and in context. The edited, final product version must reflect the spirit and tone of the unedited material and must not alter or misrepresent the original meaning. This guideline applies to documents, interviews, photographs, audio and video – whether recorded by us or obtained from outside sources.

*Id*. at ¶ 78.

Telemundo's Policies required that at least Mr. Gonzalez, the reporter who prepared the News Report, ensure that all the facts to be presented in the News Report were presented in the proper context.

Telemundo's Policies required that the edited, final product version must reflect the spirit and tone of the unedited material and must not alter or misrepresent the original meaning. This guideline applies to documents, interviews, photographs, audio and video -- whether recorded by us or obtained from outside sources.

Breaking News is news that is unfolding or happening in real time and has to be reported on with urgency. The News Report was not breaking news.

Telemundo knew that Larreal had been "arrested for a bench warrant pertaining to a traffic violation" as early as December 2018, and no later than January 9, 2019, more than two months before it aired the Clarification on March 27, 2019. *Id*. at ¶ 89.

Seven of the eight arrest reports contain the word "COCAINE" in all caps, but Larreal's arrest report does not. *Id*. at ¶ 92.

Larreal's arrest report lists the charges with which he was charged, in all caps, as "WARRANT TYPE: BENCH WARRANT BW," and below that on the same page it states

10

in all caps, "WARRANT# / CASE# A2752PP," "WARRANT DATE: 12/20/2016, TOTAL BOND: 2000.00," and "REF CHARGE: BOND AMT: NO DR LICENSE." *Id.* at ¶ 94.

After the News Report aired and was available on Telemundo's website, accessible to the general public, Larreal says, he began to be harassed and mocked at work as a "drug dealer" and was derisively called "El Chapo." *Id.* at ¶ 96. According to Larreal, he also experienced shame from his family and friends both in Miami and in Venezuela after they saw the News Report, and he suffered abuse on social networking sites that he was a part of, as well as by phone from people calling to insult and abuse him. As a result, Larreal says, he began experiencing mental anguish, loss of sleep, crying spells, headaches, and depression.

No one working on the News Report, including Mr. Gonzalez, was required to identify in the News Report all eight individuals arrested in the raid, and Telemundo could have elected to identify in the News Report only the seven individuals arrested in connection with drugs.

Gina Montaner, the Managing Editor who directly oversaw Mr. Gonzalez's work as the reporter of the News Story, never saw the finished News Story before it aired. She also never read the Arrest Reports before the News Story aired, even though she received them at the same time that Mr. Gonzalez did and even though Mr. Rodriguez testified that it was at least her and Mr. Gonzalez's responsibility to read the Arrest Reports.

Telemundo received the Mugshots and Arrests Reports almost three hours prior

to the News Report airing on April 23, 2018.

## II.     Applicable Legal Principles and Analysis

### a.     <u>Summary Judgment</u>

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Allen v. Tyson Foods, Inc.*, 121 F.3d 642, 646 (11th Cir. 1997) (citation omitted). Thus, the Court may enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

The moving party must "show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). If the movant does so, then "the burden shift[s] to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Id.* A genuine factual dispute exists "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999). The opposing party must proffer more than "a mere scintilla of evidence" to show "that the jury could reasonably find for that party." *Brooks v. Cty. Comm'n of Jefferson Cty.*, 446 F.3d

1160, 1162 (11th Cir. 2006); *Abbes v. Embraer Servs., Inc.*, 195 F. App'x 898, 899-900 (11th Cir. 2006) (internal quotations omitted).

When deciding whether summary judgment is appropriate, the Court views all facts and resolves all doubts in favor of the nonmoving party. *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1247 (11th Cir. 2013) (affirming order denying defendant's summary judgment motion on qualified immunity because of factual issue). And when conflicts arise between the facts evidenced by the parties, courts must "credit the nonmoving party's version." *Id.* at 1252.

If there are any factual issues, the Court must not decide them; it must deny the summary judgment motion, and the case then proceeds to trial. *See Whelan v. Royal Caribbean Cruises Ltd.*, No. 1:12CV-22481, 2013 WL 5583970, at *2 (S.D. Fla. Aug. 14, 2013) (citing *Envtl. Def. Fund v. Marsh*, 651 F.2d 983, 991 (5th Cir. 1981)). The Court cannot weigh conflicting evidence to resolve factual disputes. *See Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1140 (11th Cir. 2007) (citation omitted) (reversing in part summary judgment). Even when the parties "agree on the basic facts, but disagree about the inferences that should be drawn from these facts[,]" summary judgment "may be inappropriate." *Whelan*, 2013 WL 5583970, at *2. *See generally Johnson v. NCL (Bahamas) Ltd.*, No. 16-21762, 2017 WL 1293770, at *2 (S.D. Fla. Feb. 3, 2017) (denying summary judgment motion in passenger's slip and fall lawsuit against cruise ship operator).

Nevertheless, as the Eleventh Circuit has recognized, summary dismissal of

*defamation* cases is particularly appropriate because "there is a powerful interest in ensuring that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation." *Michel v. NYP Holdings*, 816 F.3d 686, 702 (11th Cir. 2016) (explaining that publishers must be given the "breathing space" necessary to ensure "robust reporting" on public figures and public events and noting that "forcing publishers to defend inappropriate suits" would "constrict that breathing space").

In other words, according to at least some courts, "because of the importance of free speech, summary judgment is the 'rule,' and not the exception, in defamation cases." *Guitar v. Westinghouse Elec. Corp.*, 396 F. Supp. 1042, 1053 (S.D.N.Y. 1975) (citing *Bon Air Hotel, Inc. v. Time, Inc.*, 426 F.2d 858 (5th Cir. 1970)), *aff'd*, 538 F.2d 309 (2d Cir. 1976); *see also Steaks Unlimited, Inc. v. Deaner*, 623 F.2d 264, 275 n.56 (3d Cir. 1980) (affirming summary judgment in defamation action in favor of media defendants and citing *Guitar*); *cf. Torgerson v. Journal, Inc.*, 563 N.W.2d 472, 479 (Wis. 1997) (affirming appellate court's order reversing trial court order denying defendant newspaper's summary judgment motion in defamation action and affirming trial court's dismissal of action, citing *Guitar* and citing *Time, Inc. v. Hill*, 385 U.S. 374, 401-02 (1967) (Douglas, J. concurring) for the rule that "summary judgment may be particularly appropriate in defamation actions in order to mitigate the potential 'chilling effect' on free speech and the press that might result from lengthy and expensive litigation"); *see also Terry v. Journal Broadcast Corp.*, 840 N.W. 2d 255, 263 (Wis. Ct. App. 2013) (affirming summary judgment for media defendant and

using standards articulated in *Guitar* and in Justice Douglas' concurrence in *Time*).

    b.    <u>The Fair Report Privilege</u>

The fair report privilege is news media's qualified privilege "to report accurately on information received from government officials." *Rasmussen v. Collier Cty. Publ'g Co.*, 946 So. 2d 567, 570-71 (Fla. 2d DCA 2006). Florida courts have borrowed from the Restatement (Second) of Torts § 611 in describing the privilege. *See, e.g., Woodard v. Sunbeam Television Corp.*, 616 So. 2d 501, 502 (Fla. 3d DCA 1993) (quoting Restatement (Second) of Torts § 611 cmt. b (Am. Law Inst. 1977)) ("If the report of a public official proceeding is accurate or a fair abridgement, an action cannot constitutionally be maintained, either for defamation or for invasion of the right of privacy.").

Although its first uses were related to official proceedings -- like court proceedings -- the privilege has since been expanded to cover a wide range of government-derived sources. *Folta v. New York Timex Co.*, Case No. 1:17-cv-246, 2019 WL 1486776, at *2 (N.D. Fla. Feb. 27, 2019).

The privilege's application is a question of law. *Id*. at *1 (citing *Huszar v. Gross*, 468 So. 2d 512, 515-16 (Fla. 1st DCA 1985)); *cf. Nix v. ESPN, Inc.*, 772 F. App'x 807 (11th Cir. 2019) (applying New York law[2] and affirming order dismissing with prejudice statements protected by fair report privilege and holding that trial court may determine applicability

---

[2]    The parties here do not dispute the applicability of Florida law concerning the qualified fair report privilege.

of fair report doctrine as a matter of law).

The privilege in Florida is a qualified one, and it broadly extends to the publication of the contents of public records and statements from government officials. *Woodard*, 616 So. 2d at 502-03 (finding that the fair report privilege covers information reporter received from Attorney General's Office and contained in a report from the Florida Department of Law Enforcement); *Stewart v. Sun-Sentinel Co.*, 695 So.2d 360, 362 (Fla. 4th DCA 1997) (finding that the fair report privilege covers information in press releases issued by the sheriff's office); *Rasmussen*, 946 So. 2d at 570-71 (determining that the fair report privilege covers "reports by government officials"); *Huszar*, 468 So. 2d at 516 (concluding that "remarks" of a government attorney relating to a possible action by the comptroller's office are privileged).

Once the fair report privilege attaches, it can be defeated only where the challenged report is not "reasonably accurate and fair" in describing the contents of government records and information. *Woodard*, 616 So. 2d at 502 (citations omitted).

This qualification simply requires the publication or broadcast be a **substantially correct** account of information contained in public records or from a government source. *See, e.g., Rasmussen*, 946 So. 2d at 570 (finding that the privilege applied because the publications were "substantially truthful" accounts of public records); *Alan v. Palm Beach Newspapers, Inc.*, 973 So. 2d 1177, 1180 (Fla. 4th DCA 2008) (finding that the privilege applied because reporting of official proceeding was correct); *Stewart*, 695 So. 2d at 362

(finding that the privileged applied because there were "no material differences" between reports and information contained in government files); *Ortega v. Post-Newsweek Stations, Florida, Inc.*, 510 So. 2d 972, 977 (Fla. 3d DCA 1987) (finding that the privilege applied to "substantially accurate" report of official proceeding); *Jamason v. Palm Beach Newspapers, Inc.*, 450 So. 2d 1130, 1132 (Fla. 4th DCA 1984) (citations omitted) (privilege requires "that the report of the judicial proceeding must be correct").

Courts assessing Florida's qualified fair report privilege acknowledge that "[i]t is not necessary that [the publication or broadcast] be exact in every immaterial detail or that it conform to the precision demanded in technical or scientific reporting. It is enough that it conveys to the persons who read it a substantially correct account of the proceedings." *Woodard*, 616 So. 2d at 502-03. Therefore, a plaintiff's claim that the information derived from the government records is false is irrelevant to the Court's analysis. *Id.* at 502 (privilege applies "even if the official documents contain erroneous information"); *Ortega*, 510 So. 2d at 976 (finding that the press has no duty to independently determine accuracy of government records).

Because the fair report privilege is broad and because "its fair and accurate bar is a low standard," there are several practical ramifications arising from its applicability, which are summarized by *Folta*: (1) the protection is not lost by "colorful language or a failure to look beyond the government documents for verification"; (2) "editorial style is expected, and news media can phrase their coverage to catch . . . the reader's attention";

17

(3) the media can also "select the focus of a piece and have no duty to further investigate or verify government-produced information"; (4) a "publication's language does not have to be technically precise in discussing legal proceedings"; (5) media defendants "can add color"; (6) media defendants are "not required to regurgitate the exact, precise language of their government sources"; (6) media defendants can also "summarize and focus publications as they choose"; (7) media defendants are "under no obligation to include additional information that would portray the Plaintiff in a more favorable light"; and (8) the press can "select the focus of their own publications, without regard to presenting both sides of every issue." *Folta*, 2019 WL 1486776, at *4, *7-8 (citations omitted).

      c.     <u>Context Is Critical: The Media and the First Amendment in 2020</u>

Before assessing the fair report privilege at the heart of Telemundo's summary judgment motion, the Undersigned believes it appropriate to flag some of the policy considerations underlying the fair report privilege.

As explained in *Folta*, Florida's fair report privilege is a common law one, and it exists "largely enshrined in state and federal court jurisprudence alone." *Id.* at *9. Therefore, it is "only as strong as the courts that enforce it." *Id.* Both Florida's Constitution and its statutory Public Records law "indicate a weighty significance placed on citizen oversight of their government – oversight that is assisted and largely effectuated by reliance on a free press to investigate and report on government action." *Id.*

Given these critical perspectives, "a cramped reading of the fair report privilege would undercut its very purpose." *Id*. Indeed, a crabbed view of the privilege would "open the door" to less-than-meritorious suits and would "contribute to the ongoing chipping-away of the rights and privileges necessary to the press's ability to play its intended role as government watchdog." *Id*.

      d.    <u>Has Telemundo Established the Fair Report Privilege Here?</u>

As noted above, Telemundo's report did not expressly say that Larreal was arrested on drug charges during the raid on a drug charge. Instead, it reported – **accurately** -- that he was arrested during a drug raid at The Booby Trap/LaBare. Nevertheless, for purposes of its summary judgment motion, Telemundo is not seeking summary judgment on the ground that the report it broadcast is not defamatory as a matter of law.

Larreal focuses on the fact that the Telemundo broadcast included him as an individual arrested during the raid (a true fact communicated by MDPD) when his arrest actually arose from a traffic-related bench warrant having absolutely nothing to do with drugs. While correct, this reality does not render the fair report privilege unavailable for Telemundo.

Telemundo is not the person or entity who created the connection between his arrest and the implication that he was arrested on drug charges during a drug raid. **MDPD** lumped Larreal's mugshot and arrest report in between the mugshots and arrest

reports for the seven persons who had been arrested at the complex for drug offense charges. Telemundo reported that he was arrested during the raid, an indisputable fact. And it did so after confirming an earlier Miami Herald Story and in response to a request for information about **the operation**.

To be sure, Telemundo did not *also* say that he was arrested on a traffic-related bench warrant. But that does not invalidate the fair report privilege, nor does it establish Larreal's theory that Telemundo manipulated the facts.

For all practical purposes, Larreal focuses on the fact that he believes Telemundo improperly grouped him in with the other arrestees. But this is similar to the scenario in *Folta*, where a university professor claimed he was inaccurately "lumped in" with other academics who received defamatory statements. The *Folta* Court had sympathy for the Plaintiff professor, but it ultimately held that the fair report privilege protected "a summary statement that more precisely described the situation of other[s] similarly situated . . ., **even despite it being technically inaccurate as to the plaintiff**." *Id.* at *7. (emphasis added).

In upholding the fair report privilege, the *Folta* Court relied on *Rasmussen*, where the appellate court, based on the fair report privilege, affirmed summary judgment in favor of a newspaper publisher and explained that a media defendant "need not describe legal proceedings in technically precise language." 946 So. 2d at 570. And *Rasmussen* relied on *Clark v. Clark*, No. 93-47-CA, 1993 WL 528464 (Fla. 4th DCA June 22, 1993) for

the principle that "journalists should have certain leeway in their choice of language when covering the criminal justice system." *Id.*

Honing in on the fact that Telemundo did not expressly say that he was arrested on a bench warrant unconnected to the drug raid in which he was arrested, Larreal contends that Telemundo cannot successfully invoke the fair report privilege because it omitted this critical fact and actively manipulated other facts.

The Undersigned is not persuaded and disagrees.

Telemundo had no duty to independently investigate information provided to it by MDPD in response to a request for arrest reports and mugshots regarding the raid. *See Ortega*, 510 So. 2d at 976 (finding that a broadcaster's only responsibility was to accurately report the statements contained in government records **even if it knew or should have known the contents of those statement was inaccurate**).

Moreover, Telemundo was similarly not required to include the specifics of Plaintiff's arrest. For example, the plaintiff in *Carson v. News Journal Corp.*, argued that omitting the fact that plaintiff's discharge was for reasons other than misconduct and that he was ultimately awarded unemployment compensation benefits (facts that **could be gleaned from the records provided**) rendered a newspaper's report that he was discharged for "unsatisfactory work performance" outside the scope of the fair report privilege. 790 So. 2d 1120, 1222 n.1 (Fla. 5th DCA 2001). Despite these omissions, the court affirmed summary judgment on fair report grounds. *Id.* at 1122.

21

Although *Carson* is not a defamation by implication case, defamation by implication claims are governed under Florida law by the same privileges and protections afforded traditional defamation claims. *Jews for Jesus, Inc. v. Rapp*, 997 So. 2d 1098, 1108 (Fla. 2008) ("All of the protections of defamation law that are afforded to the media and private defendants are therefore extended to the tort of defamation by implication."); *Jeter v. McKeithen*, No. 5:14-cv-189, 2014 WL 4996247, at *1 (N.D. Fla. Oct. 7, 2014) (finding fair report privilege applied to defamation by implication claim and noting that "the press need not investigate the accuracy of official statements before reporting their contents").

Furthermore, Larreal's focus on the type of defamation he is asserting -- i.e., one based on an implication theory -- as a legally sufficient distinction is unconvincing for yet another reason: the fair report privilege does not turn on the nature of the defamatory statement alleged. Instead, it simply depends on whether any such statement accurately conveyed information provided by a government source. *See Jamason v. Palm Beach Newspapers, Inc.*, 450 So. 2d 1130 (Fla. 4th DCA 1984) (finding headline that accused police chief of taking bribes to be protected by fair report privilege).

Telemundo did not expressly mention the specifics of any of the individuals arrested. (It did briefly *show* portions of Johanni Cortez's arrest report). But regardless of the charges against the other individuals, the fact that Larreal was arrested on a bench warrant alone does not rebut or undermine Telemundo's accurate reporting about the operation's arrests or change the gist of the story. *See Folta*, 2019 WL 1486776, at *8

("Defendants are under no obligation to include additional information that would portray the Plaintiff in a more favorable light."). At bottom, Telemundo accurately reported the gist of the information provided by MDPD: Larreal was one of several people arrested during a drug raid.

For all practical purposes, Larreal's primary concern is that he was somehow grouped together with several other employees who were specifically charged with drug offenses. But this dynamic does not destroy the fair report privilege. For example, the *Folta* Court, in rejecting Plaintiff's argument that he was inaccurately and improperly "lumped in" with defamatory statements about other academics, explained:

> Plaintiff's involvement with industry groups was different in kind from that of some other professors. This Court understands Plaintiff's frustration with being 'lumped in' with others and arguably being touted as the poster child for such quid pro quo transactions when others had notably deeper and more involved relationships.

2019 WL 1486776, at *8.

Nonetheless, the *Folta* Court found the fair report privilege applicable to protect the publication.

And to the extent that Larreal was lumped in, it was MDPD who, for all practical purposes, connected his arrest to the drug raid by including his mugshot and arrest report with the pdf file sent in connection with The Booby Trap drug raid arrests.

The "broad" fair report privilege "requires only that the publication be 'substantially' correct in its representation of the information received." *Id.* at *4 (internal

citation omitted). And "[d]etermining whether **a report** is fair and accurate requires a close comparison of **the report** and the documents and information from which it is drawn." *Id*. (emphasis added).

The "report" here is one about the undercover raid and the arrests, not a news story about Larreal or a broadcast focusing on Larreal. From Larreal's perspective, the most important part of the "report" might be the brief mention of his name, but the report itself involved a far-broader topic. Larreal's involvement as one of eight arrestees was one of many details. Moreover, Telemundo's request for additional information from MDPD (after first confirming the accuracy of the Miami Herald story with MDPD) was for "the mug shots and arrest reports regarding **the operation at Bobby [sic] Trap**." [ECF No. 65, ¶ 53 (emphasis added)].

Comparing Telemundo's reporting about the undercover operation and subsequent arrests to the information provided by MDPD demonstrates that there are no material differences. Accordingly, Telemundo's reporting is a "substantially correct account" of information provided by government sources and is covered by the fair report privilege. *Woodard*, 616 So. 2d at 502-03; *see also Stewart*, 695 So.2d at 362 (emphasis added) ("[O]ur **comparison** of the defamatory information with the official documents or press releases issued by the sheriff's office leads us to conclude that there are **no material differences**."); *see also Carson*, 790 So. 2d 1120 (finding omission of information did not defeat the privilege).

Larreal was not the focus of the story. The news report was substantially correct in providing the gist of what Telemundo received from MDPD in response to a request for information about the operation.

Telemundo accurately reported on the information received from MDPD: that Larreal was arrested during and as part of the drug raid. So the broadcast is a substantially correct version of what MDPD provided. *See, e.g., Carson*, 790 So. 2d at 1122 (discussing that the focus of report was the explanation from Plaintiff's former employer about the reasons for his discharge, not whether he was entitled to unemployment compensation benefits). Additionally, in *Woodard*, 616 So. 2d at 502-03, the Court affirmed summary judgment in favor of the news broadcaster on the fair report privilege even though the report stated that Plaintiff had served four years in jail for murder when he was convicted only of *attempted* murder and served only *two* years of a four-year sentence. The investigative reporter obtained the information from the Florida Department of Law Enforcement, which stated that Plaintiff had been convicted of "homicide – willful kill," had received a four-year sentence and had been paroled approximately two years later. *Id.* at 502.

Larreal accuses Telemundo of actively manipulating the story because it did not present the *mugshots* exactly as they were provided by MDPD. But there is no evidence that Telemundo *altered* the mugshots. Instead, it merely used visual effects, such as moving the first four mugshots into the screen and then have them fade out with a copy

of The Booby Trap in the background. Larreal's mugshot appeared on the screen and the last three mugshots were presented together on the full screen. His mugshot was the only one shown when his arrest was mentioned.

Larreal may have *preferred* that Telemundo did not use visual effects when presenting his mugshot, but his "preference is not the yardstick by which statements in a news report are measured." *Folta*, 2019 WL 1486776, at *5. Moreover, Telemundo was not required to display the mugshots in the exact manner they were provided by MDPD. *See Woodard*, 616 So. 2d at 502-03 ("It is not necessary that [the publication or broadcast] be exact in every immaterial detail. . . .").[3]

Likewise, the fair report privilege does not dictate that news organizations report on the contents of official files in sterile language. Rather, news reporting may be "phrased to catch the . . . readership's attention" without losing the protection afforded by the privilege. *See Alan v. Palm Beach Newspapers, Inc.*, 973 So. 2d 1177, 1180 (Fla. 4th DCA 2008). And the media is free to select the focus of its reporting without losing the protection of the fair report privilege. As the *Folta* Court explained, the privilege's "fair and accurate bar is a low standard." 2019 WL 1486776, at *7 (internal citation omitted). The presentation of Larreal's mugshot -- even if it did capture the viewership's attention -- does not defeat the fair report privilege.

---

[3]     Plaintiff was named fifth in the News Report, corresponding to the fact that his was the fifth arrest report provided by MDPD in the group of eight.

Larreal also emphasizes Telemundo's internal policies and guidelines, contending that it violated those policies. Telemundo disagrees, contending that it did not violate its own policies and guidelines. But this debate is legally irrelevant for Telemundo's summary judgment motion. The issue is whether Telemundo met the elements of the fair report privilege, not whether it violated an internal guideline. In other words, the issue is whether the information obtained from MDPD was accurately reported (i.e., was the report substantially correct).

As one well-known case (in the niche area of fair report privilege) decided by a Florida state appellate court explained:

> The newspaper, had it wished, could have devoted the entire issue to the statement without any effort to neutralize the accusation by giving the accused the opportunity to deny. The question then becomes how well does the editor sleep with his own conscience, which again is our concern as human beings desirous of a fair world, not as judges resolving a legal issue.

*Jamason*, 450 So. 2d at 1133.

MDPD did not flag for Telemundo the point that Larreal (but not the other seven arrestees) was not arrested on drug charges. It did not forward the information with an email or other communication warning Telemundo that Larreal was in a class of one and was different than the other seven arrestees. Likewise, MDPD did not disclose that the undercover drug "operation" resulted in seven employees arrested on drug charges and one employee arrested on an unrelated bench warrant for failing to appear for a traffic citation for no driver's license. Instead, it merely forwarded all the

information together, lumping together all arrestees as part of an MDPD response to a request for information about the undercover drug "operation."

As explained in *Folta*, "Florida's fair report privilege requires that a report be "accurate and complete or a fair abridgment" of the underlying information. *See, e.g.*, *Huszar*, 468 So. 2d at 516 (quoting Restatement (Second) of Torts § 611). Fair abridgment can occur when media defendants accurately summarize separable portions of government records. *Folta*, 2019 WL 1486776, at *8 (citing *Carson*, 790 So. 2d at 1122).

Telemundo's broadcast was a fair and accurate summary of information received from MDPD about those arrested in the undercover drug operation.

Similar to the *Folta* Court's analysis, the Undersigned acknowledges Larreal's likely frustration, and I am sympathetic to his situation. But the fair report privilege applies, and the news broadcast is not actionable for defamation.

To deny Telemundo's summary judgment motion would be tantamount to depriving a television news broadcaster with the "breathing space" which our appellate court has held is necessary to ensure robust reporting. *Michel*, 816 F.3d at 702.

Telemundo is therefore entitled to summary judgment on the fair report privilege, and the Undersigned **respectfully recommends** that Judge Cooke **grant** Telemundo's summary judgment motion. *See generally Rasmussen*, 946 So.2d at 570 (finding fair report privilege provides protection when the news story is based on information from

government officials and is "reasonably accurate and fair" and that fair report privilege "shielded the Daily News from libel" even though it published a clarification).

e.     An Undocumented Worker's Economic Damages for *Future* Work

Given that Telemundo is entitled to summary judgment, there would be no need to analyze other issues *if* Judge Cooke were to adopt this Report and Recommendations. I do not have a legal crystal ball, though, so it is prudent to provide an analysis of other issues, in the event that the Court were to rule otherwise on the fair report privilege.

In his Complaint, Plaintiff alleges that "[a]s a direct and proximate cause of Defendant's actions, Plaintiff lost his employment." [ECF No. 1-1, p. 9]. Significantly, Larreal seeks damages for **future work he has not yet performed**, as opposed to a claim for wages for work he has already done.

Telemundo highlights the fact that Larreal was not eligible for employment in the United States at the time of the police raid and the Telemundo news broadcast (and is still not eligible to legally work in the United States). Therefore, Telemundo argues, any claim predicated on lost future wages must be rejected as a violation of the United States' immigration laws. [ECF No. 64, pp. 10-13].

Congress enacted the Immigration Reform and Control Act ("the IRCA"), 8 U.S.C. § 1324a, with an extensive employment verification system to discourage the employment of undocumented workers. *See Hoffman Plastic Compounds, Inc. v. NLRB*, 535 U.S. 137, 147 (2002) (precluding an award of lost wages and reinstatement to an

undocumented worker because the job was obtained by a criminal fraud and the lost wages could not lawfully have been earned in the first place).

The employment verification system requires employers to verify the identity and eligibility of all new hires by examining specified documents, such as a social security card, before they may begin working. *See generally* 8 U.S.C. § 1324a(b); *see also Hoffman*, 535 U.S. at 148. If an undocumented applicant does not present the requisite documentation, then he or she cannot be hired. *Id*. Undocumented employees attempting to undermine the employer verification system, as well as employers violating the IRCA's employment verification system, are subject to civil fines and criminal prosecution. *See* § 1324a(e)(4)(A); § 1324(a)(f)(1); § 1324c(a); 18 U.S.C. § 1546(b); *see also Hoffman*, 535 U.S. at 148.

With the IRCA in place, the United States Supreme Court has noted that "it is impossible for an undocumented alien to obtain employment in the United States without some party directly contravening explicit congressional policies." *Hoffman*, 535 U.S. at 148.

Here, Larreal does not dispute his status as an undocumented alien, unauthorized to work in the United States. [ECF No. 130, p. 18]. The record demonstrates that Plaintiff has been unlawfully residing in the United States since August 2016 when he overstayed a temporary visitor visa. [ECF No. 65 at ¶¶ 3, 5]. During his time in the United States, Larreal has not attempted to obtain legal status -- but he has unlawfully procured work

from various employers, including through the fraudulent use of the names and identities of various individuals to procure some of that work. *Id.* at ¶¶ 3, 5, 12, 20, 27-31, 34-36, 48. Larreal has also intentionally failed to file tax returns, report his earnings, or pay taxes. *Id.* at ¶ 6.

In following *Hoffman's* line of reasoning, the Court in *Veliz v. Rental Serv. Corp. USA*, 313 F. Supp. 2d 1317, 1335-36 (M.D. Fla. 2003), held that an undocumented worker could not recover lost wages for work to be performed, as such an award would be "tantamount to violating the IRCA." *Id.* at 1336. While *Veliz* is not binding on this Court, the Undersigned agrees with the Court's reasoning in denying an undocumented worker's claim for future lost wages or an award for work never to be legally performed.

In *Veliz*, after an undocumented worker was killed in a workplace forklift accident, the worker's personal representative of his estate brought a products liability suit, seeking to recover lost wages for unperformed work. *Id.* at 1319. The Court granted the defendants' summary judgment motion, finding that the plaintiff could not recover lost wages because the undocumented worker was, as an initial matter, ineligible for employment in the United States. *Id.* at 1334-35.

The same result must occur here. "The policies that motivated the enactment of the IRCA are certainly subject to debate, but the IRCA is the law of the land, and the Supreme Court has made it clear that awarding back pay to undocumented aliens contravenes the policies embodied in that law. An award of front pay would be

inappropriate for the same reason: front pay essentially assumes that the worker will continue to work for the employer in the future, which is against the law for an undocumented alien." *Renteria v. Italia Foods, Inc.*, No. 02 C 495, 2003 WL 21995190, at *6 (N.D. Ill. Aug. 21, 2003); *Hernandez-Cortez v. Hernandez*, No. 01-1241-JTM, 2003 WL 22519678, at *7 (D. Kan. Nov. 4, 2003) ("Accordingly, the court finds that Benito Hernandez–Cortez's status as an illegal alien precludes his recovery for lost income based on projected earnings in the United States.").

At the hearing on Telemundo's summary judgment motion, Larreal conceded that he was unaware of any legal authority (binding or otherwise) which would entitle an undocumented alien like Larreal to obtain damages for future lost wages in the absence of a physical injury. Although he cited to cases in which undocumented workers could collect for unpaid wages for work *already* performed[4] or for *physical injuries* sustained while illegally working,[5] he could point to no legal authority on the controlling question

---

[4]     *See, e.g., Patel v. Quality Inn South*, 846 F.2d 700, 705-06 (11th Cir. 1988) (reversing summary judgment in favor of employer in claim for unpaid minimum wages and overtime under the Fair Labor Standards Act and emphasizing distinction between claim for work **already performed** and claims for back pay requested by deported alien employees who were deported -- and who could not recover in *Sure-Tan, Inc. v. NLRB*, 467 U.S. 883 (1984)).

[5]     *See, e.g., Cano v. Mallory Mgmt.*, 760 N.Y.S. 2d 816 (N.Y. Sup. Ct. 2003) (denying motion to dismiss filed by electric meter owner in personal injury lawsuit brought by unlawful alien for burns allegedly sustained when meter exploded during his employment and holding that plaintiff's undocumented status may be presented to the jury on lost wages but not on the issue of pain and suffering).

here. And, as noted, there is ample authority (albeit not binding) which undermines and rejects his claim.

The Undersigned finds that Plaintiff's immigration status as an undocumented overstay precludes recovery of lost future earnings as a matter of law, and therefore **respectfully recommends** that the District Court (assuming it even needs to reach the issue in the first place) **grant** Telemundo's summary judgment motion on the Plaintiff's claim for economic damages -- lost wages for unperformed work.[6]

f.     Non-Economic Damages

Telemundo's summary judgment motion also advances the theory that Larreal cannot recover non-economic damages because he "cannot carry his burden of proving these damages [i.e., for mental anguish, personal humiliation and reputational injury]

---

[6]     Telemundo also contends that Larreal has not presented any evidence of economic loss, which means that it would be entitled to summary judgment even if his immigration status did not bar his recovery. Assuming that Judge Cooke would even reach this argument (which would happen only if Judge Cooke were to reject the fair report privilege *and* also reject the undocumented alien rule), the Undersigned views this additional argument to be based on disputed issues of material fact, thereby rendering it unavailable for summary judgment resolution. At his deposition, Larreal testified about his economic damages. Telemundo may have evidence-based arguments to undermine his testimony and may even have evidence to suggest that it is false or exaggerated, but this type of contest creates a dispute best reserved for trial. *See Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1253-54 (11th Cir. 2013) (affirming denial of defendants' summary judgment motion and noting that "as a general principle, a plaintiff's testimony cannot be discounted on summary judgment unless it is blatantly contradicted by the record, blatantly inconsistent, or incredible as a matter of law"); *see also D/S Ove Skou v. Hebert*, 365 F.2d 341, 346 (5th Cir. 1966) (stating factual disputes "are the stuff of which lawsuits are made").

were caused by the News Report." [ECF No. 64, pp. 17-18]. Telemundo brands his testimony about loss of sleep, occasional pressure in his head, accompanied by dizzy spells and depression as "self-serving assertions." *Id.* at p. 18. They may well be, but that would not entitle Telemundo to a summary judgment in its favor. *See Feliciano*, 707 F.3d at 1253 (observing that Plaintiff's self-serving assertions are "no more conclusory, self-serving or unsubstantiated by objective evidence" than the assertions of the police officers and holding that the nature of sworn statements "alone does not permit us to disregard them at the summary judgment stage").

In addition, the mere fact that Larreal has tried to establish teasing through what Telemundo says is inadmissible hearsay does not mean that his entire claim must be rejected through an adverse summary judgment ruling. First, it is not clear that all the evidence would be inadmissible hearsay. Some of it might be admitted under the rule that the evidence is not being used to establish the truth of the matter asserted. And second, it might mean that he could not use this *specific* testimony at trial but could use other evidence which would be admissible.

Therefore, if Judge Cooke were to reach this issue, the Undersigned **respectfully recommends** that the Court **deny** this portion of Telemundo's motion concerning Larreal's claim for non-economic damages.

### III.    Objections

The parties will have fourteen (14) calendar days from the date of being served with a copy of this Report and Recommendations within which to file written objections, if any, with the District Judge. Each party may file a response to the other party's objection within fourteen (14) calendar days of the objection. Failure to timely file objections shall bar the parties from a de novo determination by the District Judge of an issue covered in the Report and shall bar the parties from attacking on appeal unobjected-to factual and legal conclusions contained in this Report except upon grounds of plain error if necessary in the interest of justice. *See* 28 U.S.C. § 636(b)(1); *Thomas v. Arn,* 474 U.S. 140, 149 (1985); *Henley v. Johnson,* 885 F.2d 790, 794 (11th Cir. 1989); 11th Cir. R. 3-1 (2016).

**RESPECTFULLY RECOMMENDED i**n Chambers, in Miami, Florida, on September 21, 2020.

_____
Jonathan Goodman
UNITED STATES MAGISTRATE JUDGE

**Copies furnished to:**
The Honorable Marcia G. Cooke
All counsel of record